Good morning, and may it please the court. My name is Mark Carlson, and I am counsel for Rearden, LLC, Rearden MOVA, LLC. The appellant's here today, and with me at the counsel table is the CEO of Rearden, Mr. Steve Perlman. All right. Do you wish to reserve any time for rebuttal? I do, Your Honor. I'd like to reserve two minutes, please. Okay. Keep track of your time, but I'll try to remind you. I'd like to start, Your Honor, with the court's ruling on judgment as a matter of law of no vicarious copyright infringement. And the issue for the court here is that on the record presented, was there evidence that a reasonable jury could have relied on to come to a verdict of vicarious copyright infringement? And when we tried this case, we modeled our case on two very important cases, one of which is the landmark Shapiro-Bernstein v. H.L. Green case from the Second Circuit, and the other is Fonavisa v. Cherry Auction, which adopted the Shapiro-Bernstein case into the Ninth Circuit. The standard for vicarious infringement, as it's been given to us by the Supreme Court, numerous circuit courts, numerous district courts, is two elements, that there be a legal right and practical ability to supervise or control the infringing conduct, and that the vicarious infringer have a direct financial interest in that conduct. Here the jury found that both elements had been proven. The district court found that the direct financial interest element had been proven. Disney doesn't appeal that. Can you be really specific? I think this will boil down to two things. What was the notice of Mr. Reardon's ownership claim, and then what was the basically ability to control or supervise DD3, and what notice they had? So two questions I have for you are what notice Disney would have had of Mr. Reardon's ownership claim, and then second, how many times did the copyright notice appear during the MOVA capture sessions, and did they only appear during the June 2016 reshoot? Or did they show up any other time? Okay, thank you, Your Honor. Let's be specific. That would be helpful. Yes. So first, with respect to notice, it's our position here, and I hope to convince the Court, that notice is not an element of vicarious copyright infringement. And so no notice was required, and so we didn't have to prove that at trial. With respect to the copyright notice, that appeared every time a segment of MOVA-captured material was played. So if a scene was taken using MOVA, and then the technicians replayed it, the first screen would have displayed... But the registration happened in February of 2016, so presumably notice of the registration notice wouldn't have shown up before the registration, right? Right, but we must separate the issue of registration of the copyright from the issue of existence of the copyright. And existence of the copyright is established at the time that the work is fixed in a tangible, reproducible copy. So what would have been on the, I don't know what you want to call it, the MOVA screen before the registration? Would it still have... Yes. What would it have said? Yes, we've reproduced that in our papers, but what it says is copyright, Reardon LLC, there's the C and a circle. It's the classic, statutorily provide copyrighted notice and copyright owners. So that notice you've just identified would have been there before the registration in February of 2016? Yes. So would that have been throughout? So the contract was signed in March of 2015? In 2015. Okay, so that notice would have been on the MOVA screens from the time that contract was signed? Yes, Your Honor, it was built into the software. Okay, so then the only thing you added after registration was the specific registration information, is that correct? Well, we couldn't add anything because the software was in the possession of DD3 at that point. We did not have possession of the software, so DD3 had that. All that was in there was the copyright notice that had been built into the software when it was first developed. Okay, so then, okay, I think, thank you for clarifying this, because I thought it would only show up in the reshoot after the registration. But you're saying all of the shoots should have had that Reardon copyright notice? Correct, and that's a perfectly appropriate use of a copyright notice, even though the copyright is at registration. And explain how it works. The MOVA screen shows up until you press a button to start that motion. That will stay on the screen, is that right? Exactly, it's a click-through. So the first screen or first frame of the captured sequence, that is the copyright notice, and it would appear on any screen in the room where the video is being replayed. And then in order to play the scene back so that you could look and see what you'd captured, you had to click through that. So that notice was present in the room when infringement was occurring and when Disney representatives were present supervising the conduct of DD3. But knowing that there's a copyright isn't the same as knowing there's infringement. So the Disney representatives may have seen that, but they had a contract with DD3 that required indemnification, and so it would seem they could rely that DD3 had permission to use copyright software. Let me address that, Your Honor, because, again, what I hope to convince the Court of is that there is no requirement under vicarious copyright infringement for there to be knowledge, reason to know, or notice of infringement. But they have to have a, you know, the district court found there has to be sort of a practical ability to do something, and if they have no idea that there's a problem, why would they do anything? But, yes, that's what the district court found, but that's simply not required for vicarious copyright infringement. So you're arguing it's more of a strict liability standard that you're on the hook here. Absolutely, Your Honor. It is a strict liability standard. And the — I commend the Shapiro-Bernstein case to the Court because it's a very thoughtful case, and it specifically addressed this issue of why it's jurisprudentially sound to hold an innocent vicarious infringer liable even without knowledge of the infringement. And what the Court said is that we hold them liable for vicarious infringement as a matter of risk and incentive allocation. And it said three things. It says where the vicarious infringer has the power to police the conduct of the direct infringer, imposing liability will encourage the vicarious infringer to do so. And, secondly, the Court held where the vicarious infringer has a direct financial interest in the infringement, it's just to impose the burden of liability on the party who benefits. And then, thirdly, the Court dealt with the issue that this Court is raising, what Disney has raised, and what the Second Circuit said is even if supervision is thought to be too burdensome, the vicarious infringer has the ability to negotiate terms with the direct infringer. The vicarious infringer can require the direct infringer to obtain insurance to protect the vicarious infringer from the risk of insolvency, and they can require that the vicarious or that the direct infringer indemnify the vicarious infringer. I'm a little confused about there was an advisory jury, correct? Yes. That ended up, and they were given some instructions, and that's how they reached their verdict, right? Yes. And then the district court initially accepted that verdict, and then granted the JMOL, correct?  And so what was that advisory jury? No one's contesting the jury instructions here, right? Correct. So what were they advised the law was for that advisory jury? And then when the judge looked at it after and said, no, that as a matter of law, this is wrong, I'm trying to see that distancing them from that and relying more on the Napster and the Perfect Ten cases? Yes. Yes, Your Honor. So the district court issued the Ninth Circuit pattern instruction on vicarious liability, and that instruction, the instruction that was read to the jury, had the two elements, the two elements only that I recited to the Court at the beginning of this. And actually, Disney had sought a different instruction that included this element of knowledge or ability to know of the infringement, and the district court rejected that. And so the jury was instructed simply on those two elements. Disney offered all of their proof about their inability to find out about this infringement, and they argued that theory to the jury. And the jury agreed with us and did not credit Disney's evidence. And I think wisely, because the district court on summary judgment correctly ruled that whether a company of the resources of Disney had the practical ability to supervise or control DD3 was a question for the jury, was properly a question for the jury, and the jury considered that and decided in our favor. So on the JMLL, the judge basically said no reasonable jury that could find this, and was that based on a different iteration of the law than the instructions that were given to the advisory jury? Yes. So here's how the district court erred. Under FONAVISA, under Shapiro-Bernstein, the existence of the contract, the fact that the infringement occurred in a facility that was supervised and controlled by the vicarious infringer and that the vicarious infringer benefited, that's sufficient to establish liability. No need to prove knowledge. It was expressly rejected by the Shapiro-Bernstein court. Then what the district court said is that's not sufficient anymore, and it relied on these three cases, A&M Records v. Napster, Perfect 10 v. Amazon, and VHT v. Zillow. Now, what these three cases all have in common is that they involve a vicarious infringer who operates a website, and the vicarious infringer is a perfect stranger to the direct infringer. There is no contract between them. And when the direct infringer directly infringes, they do so in the privacy of their home or in the privacy of their personal business. And there's no Napster or Google or Zillow representative present to supervise or control them. So you can see the copyright infringer is already in trouble here, or the copyright owner is already in trouble here. So if Napster, Perfect 10, and the other case apply to this vendor situation, then the district court is right, correct? No. I would disagree. I mean, I hear you saying we apply a different standard to a vendor like this as opposed to the platform cases. Well, under FONAVISA, the facts as I related them, the contract, the fact that infringement occurs in the defendant's facility, and the financial benefit, that's sufficient without knowledge, without notice whatsoever. What the Ninth Circuit was dealing with with these three cases is a situation where there's no relationship between the direct infringer and the vicarious infringer. And in those circumstances So what you're saying, though, what I'm trying to understand is factually you're saying this is a different situation than Napster, the Napster Trio, or whatever. If the Napster Trio applies to this exact situation, I think the district court arguably could be correct. The way I Is this a factual difference from those cases? I mean, obviously we have to apply our precedent. So if, and I think your friend on the other side is arguing those cases control, and therefore under those cases, you lose. It is a factual difference. I'm just trying to mentally, it's a little tricky. The way I would put it, Your Honor, is that if there were no contract between Disney and DD3, and if DD3 did not perform its work in a facility that Disney controlled and that was supervised by Disney, if those facts weren't present, we don't have Fonovisa, and that's where we look to A&M Records, Perfect Ten, and the Zillow case. So for those three cases, those defendants were running a platform, and these were third parties that were putting up their own third-party content, whether it was they're posting their own photos on Zillow, whether they're putting their own website information content, posting content information on a third-party website on Google, and for Napster, same thing, posting their own music. Whereas in this, if I look at the Disney-DD3 contract, it's specifically a work made for hire for Disney's product by Disney's vendor, and Disney has control over its production. So this is not, that was not Google content that was the subject of that case, or Napster's content, or even Zillow's content, right? Those are third parties posting third-party content on a very high-volume tech platform, correct? Absolutely. Absolutely. That's correct, Your Honor. It's distinguished from the phone information. Let me ask you on the ownership question. So the Hollywood Reporter article is February 6, 2015. The contract between Disney and DD3 is entered the next month, in March of 2015. Correct. And I just want to understand, so there was an Oscar given for, I guess, MOVA technology used in Disney's mega-hit Guardians of the Galaxy, correct?  And so for the technical team that used the MOVA technology, they got an Oscar, and Mr. Perlman was saying he never granted a license in this case. Tell me about what it means to do an appeal for an Oscar. That's referenced in this article, and I am not familiar with what does it mean to appeal who's getting an Oscar award for the technical contribution to a Disney mega-hit film. Yes, when they award these technical achievement awards similar to an Oscar, there's a citation that goes along with it, and it describes the history of the development, the invention, what it contributed, and who was responsible for it. And Mr. Perlman saw this citation. It was published in The Hollywood Reporter, and he followed a standard procedure that the Academy provides in order to appeal and award. And you can go in, and you can challenge whether, in fact, DD3 developed that technology, which it didn't, or reared it, and that's what Mr. Perlman did. You file essentially a written appeal, and then a committee, the committee that awarded the award, they rule on whether it was correct or not. So when he appealed, that was publicized? Yes. Yes. The appeal was, the article that we put in, that was publicized. That's what prompted Mr. Perlman to say, wait a minute, I never licensed DD3 to use our technology. So that seems to be an important distinction between the platform cases, Zillow and Napster, that there was, it seems there was actual knowledge that Disney should have been aware of this dispute. It was their movie that the tech was used in. Yeah, I would characterize it as reason to know, constructive knowledge, because it was published in The Hollywood Reporter. We put in evidence that Mimi Steele reads The Hollywood Reporter. She's one of the representatives that was designated with full contractual authority here, who attended some of the MOBA sessions. She reads The Hollywood Reporter. How was that established? Through her deposition? Yes. Yes. But, you know, she said, gee, I must have missed that one. I didn't see it. The problem with, like, Zillow and Napster and Google is, I thought the court was concerned that given there were third parties, there's no contract relationship, and that the platforms didn't have the ability to essentially read all this content and find out what it was, if it was something that had a copyright. That wouldn't be the case here, if I understand this correctly. Well, Disney would have to investigate. And the fact is, they didn't do anything. They had the power to terminate this contract for copyright infringement. That contemplates that there is some form of supervision going on during the use of the software. Disney didn't do anything, did not exercise that power. So it's a matter of speculation. We will never know what Disney would have concluded if it had taken the time, used some of its fine lawyers to investigate this matter and whether it was prudent to go ahead with MOVA, given the issues that were going on. We'll never know. Let me ask, with this appeal, let's say the Academy came out with a different decision as to who should be receiving this technology award. Would they then give a different technology Oscar then? How would the appeal play out? What was the evidence of trial about? I really don't know how this appeal works. So if you could provide clarification. Sure. So what happens is Mr. Perlman wants to appeal. He fills out essentially a form that's provided by the Academy that allows him to say what his grounds for appeal are. And in this case, what he was saying is, look, none of these you are awarding this award to some people who didn't contribute at all to this technology. And DD3 didn't invent it. My company invented it. And so he put that in. If he had prevailed on that before the Academy, then the Academy would have awarded the award to Riordan, and Mr. Perlman would have been included in the people who developed it and others other than the people who the Academy gave it to. They were the people who worked for DD3 and submitted their request for the award. They wanted it for themselves. What was the evidence at trial that Disney cares about any Oscars related to its own movies? I think we regarded that as self-evident, Your Honor, that when movies win Oscars, the posters in front of the theaters all say it's an Oscar-winning movie. They promote that the actress won an Oscar for the role in the movie that's going on. I guess I don't think we put in testimony where somebody said that matters to us. But I think in everyone's common experience, that's a big deal to movie studios. So did Mr. Perlman lose that appeal with the Academy? Yes, he did. Yes, the Academy decided that they had decided correctly. Is there any level of recourse beyond the Academy? Or is that it? That's the final decision? There was. And I suppose a creative lawyer might have run off to court and filed for an injunction or something. But he didn't take that route. Then was there later an ownership determination in a court? Yes. And Riordan prevailed? Yes, it did. And that occurred after this movie was, the production was completed? Is that correct? It was after the completion of principal photography. The movie was still in post-production at the time. But yes, most of the use of MOVA occurred prior to that ruling. But it was before the release of Beauty and the Beast, which is the movie we're talking about here, right? I just want to clarify. We're not talking about Guardians of the Galaxy. Right, right. This is Beauty and the Beast at this point. All right. Let me find out. We've taken you over time, but any additional questions by the panel? Thank you. All right. So you're two minutes over. I'll give you two minutes for rebuttal since we asked you a lot of questions. Okay. Thank you, Your Honor. You're welcome. And we would submit the two evidentiary issues that we raised on the briefs. All right. Thank you. Good morning. Good morning, Judge Callahan. Thank you, and may it please the Court. I'm Kelly Klaus for Walt Disney Pictures. And the Court asked a number of factual questions. I'd like to make sure that we're clear on a few of these before we go too much farther. Judge Koh and Judge Beatty, you were asking questions about the Academy Awards. And just so we're 100 percent clear, and I didn't know all this before working on the case, we are not talking about somebody at the Kodak Theater getting the gold statue that they put on the mantle. The award in question is from the Science and Technology Committee. It is not called an Academy Award. It's called a Certificate from the Academy. I don't mean to demean it at all, but just so we're clear, this is not— It's kind of a little tiny gold statue. It's a piece of paper. It's a piece of paper with the Academy's name on it. And it's important. It's meaningful. Okay, but is it credible to think that for Guardian of the Galaxy, which was a really Marvel mega-hit owned by Disney, that Disney would not pay attention to who's getting Academy Certificates for its own hit movies? That just—and why couldn't a jury looking at this Hollywood Reporter article think, well, Disney should have known. He's saying he never granted them a license. He's appealing to the Academy. Why wouldn't Disney at least have made the effort to do a little due diligence? Because you sign the contract the very next month, March 2015, and just find out, well, I'm entering into a contract for this DD3 to do a work made for hire for me. Just make sure that they actually are licensed. Or was there no concern because they were going to indemnify Disney regardless, so it was not going to be a financial hit? So, Judge Koh, to be 100 percent clear, there was zero evidence, zero evidence in the record that anyone at Disney saw the article in the Hollywood Reporter with the protest. There was zero evidence that was introduced that this was something that was important. But a jury could infer, a jury could infer that perhaps that Disney person who said that I am responsible for signing these vendor contracts, I do read the Hollywood Reporter, I don't quite recall that one, they could have made their own credibility assessment. I believe, Your Honor, that that question is not part of the question that Mr. Carlson represented was not even part of the record. So we're going outside of the record if what we're saying is that, oh, this just must have happened. This wasn't there. There was the Hollywood Reporter. Oh, the Hollywood Reporter was an exhibit at trial, correct? It was an exhibit at trial. And there's zero evidence that anyone at Disney saw that, Your Honor. The second thing, and Judge Koh, this goes to your questions about the copyright notice. And just so we're clear on the facts of the copyright notice, there is a photo that Reardon included in its reply brief. It was Trial Exhibit 75, which shows a sample MOVA setup. To be clear, this was not Beauty and the Beast. Mr. Perlman testified that was a promotional photo that was taken during the time that Reardon owned MOVA from 2007 to 2012. And what it shows is a setup on set with people who work for MOVA or for the third-party vendor. And if I can use this courtroom as an illustration, it would be like that monitor over there. I would pretend I'm the director. Let's pretend you're Dan Stevens in the rig, acting. The people who work for Disney, their attention was this way. Zero evidence that anyone was looking at the monitors that were on the screen of the person who was doing the facial capture.  Okay. What was the evidence of what was on the screen, though? What did the – what was the evidence in trial? The evidence in trial is that the people who work for DD3, who are sitting there, that when – they have a technology that's called raw player. The format that this comes in is called raw.exe. And the evidence is that when one of those people presses the playback button, that the Whatever the year happens to be that the actual image is being made, which is not the copyright year that's relevant here. The year of creation, Judge Koh, was 2007. But that person would see what was on the screen. Now, the trial – So you're saying the date would be the date that that image would show up. How many times do you think it showed up each time? Every time a new MOVA screen came up, it would show up reared in copyright, correct? Every time that somebody played back a file on a MOVA computer, which is over here. Now, the evidence was that the files that the people at Disney reviewed were not in the raw.exe format. And I would refer Your Honor to – They were in the room when all of these – how many files are there that have reared in copyright? I have no idea how many there are. I have no idea if there was any playback. I would refer Your Honor to two things. What does it mean there was no playback? Because you just said any time you open up a file, copyright reared in would show up. Because there are – be very clear. There is a playback on a MOVA computer. The MOVA computer is capturing the data that's being done. There is a technician who works for DD3 who's sitting there typing things in. He's looking at things. What the director reviews to decide which cut am I – which shot am I going to take. I'm sorry you're not answering my question. I am trying to answer your question, Judge Kotobuki. I'm not hearing an answer to my question. Let me ask you another one. So this contract specifically says it's a work made for hire, specially ordered or commissioned by producer, and is the sole property of producer for any and all purposes whatsoever. I'm reading from page 8, section 9, ownership of the contract. That is different than a platform, right, where third parties are posting third-party content that Google doesn't control. It's a very high-volume – I think we would all agree, right, Google runs a very high-volume platform and is not going to be able – I think the technology showed that for at least some of these cases, they just didn't have the ability to look at every single image of third-party content posted by third parties. But this is a work made by – for hire by the primary vendor on these images of the beast's face. So tell me why that's not different than Napster, A10, and the Zillow case. Two reasons, Your Honor. One is there was a contract between Google and the individuals. There was a contract between Napster – But you agree it's third-party content, right? It's third-party content that's being discussed there versus – being uploaded versus this is Disney's movie, Beauty and the Beast. And that goes to the question of practical ability, Your Honor. And the language of the cases – and I want to be clear, because there is an argument that my friend on the other side was making, that these three cases are platform cases and they're distinguishable. That is, we would submit, not a fair reading of the law. The law in this area has evolved in common law fashion with a – with reliance in the platform cases on the physical cases. And what I would refer you to, Your Honor, is in the – I'd refer you to the Napster case. According to my friend on the other side, the law in this area froze with Shapiro Bernstein, saying that not – that we aren't going to look at anything – we're going to make this a strict liability tort. And the law has evolved quite beyond that. What the court in the Fonavisa case – not a platform case, plain old physical world case – what was important to the court in Fonavisa, Your Honor, was that the – that the owner of the swap meet, of Cherry Auction, controlled and paroled – patrolled the premises. That's 76F3rd at 262. But isn't that the same thing? Let's say it's a trade show. Let's say it's a flea market. You're in the same position as a third-party tech platform, right? These are third parties running their own, like you said, a swap meet, selling their own items. Let's say it's a trade show. Other companies are putting on their own trade booths. That is a different situation when it's a work made for hire, or one product by the vendor for the owner of the product. That's true, Your Honor. The – we would submit the issue is that the – what's analogous here is what is – what is detectable here. What can be controlled and patrolled? Well, it does appear that Disney had the right and ability to control DD3's product. Why doesn't that support a determination of vicarious liability even if Disney lacked the practical ability to identify the infringement? It's – you know, and I have to ask, why isn't the presence of Condon and Galb when DD3 was using MOVA in the facial motion capture process sufficient to show that Disney had the ability to identify the infringement? A couple of things, Your Honor. One is that what the – it's a two-part test that the – as the court's cases make clear, including just most recently I'll defer you to Judge Acuda's decision in the Perfect Ten versus Amazon case. And what she says, 508 F3 at 1174, is that you need both. It's not enough to have a contractual right. There's no dispute that there was a contractual right that had Disney discovered something, they had the power to terminate the relationship and to tell DD3 to do something. The question is, on the factual record in this case, was the infringing conduct reasonably detectable? That's what – that's what the Napster case says. And what Judge Acuda said in her – But what if we – what if we were to agree with Reardon that the fact that ownership was disputed was information that – that was available to Disney? Would that be sufficient? No, Your Honor, because the ownership dispute, just to be clear here, what was – what was sort of behind the curtain in terms of whether or not anything was – what could have been found, that was something that took two years before Judge Tiger for there to be a determination of whether there was ownership. Had Disney learned of the dispute, had they gone to DD3, DD3 would have given them an intercompany piece of paper that says, we have the right to use this. And the ownership dispute before Judge Tiger started in 2015, just so we're clear, it's not just that it was the question of whether it was resolved before the movie was resolved. Judge Tiger didn't issue his decision in that case until August 2017, which was a month after Reardon filed this lawsuit. And, in fact, one of the things that he said in his summary judgment ruling on contributory infringement, and the reason that the contributory infringement claim was knocked out of the case, was he said, no one could have known – it's not reasonably knowable how this would have been resolved until we went through an entire trial, and I resolved this ownership dispute. And I should also say, there was, to the point of what could have been done, Mr. Perlman obviously knew that Disney had used a vendor that used the MOVA technology in 2014. He had worked with Disney years before when – before the MOVA technology transferred ownership out of Reardon. He could have picked up the phone and called, which he never did. He could have said, that's my software. That's my technology. It's been stolen from me. So is the – all right. But the test that – the instruction that was given to the jury and that – which they came up with obviously a lot less money than what Reardon was asking for, but that being said, and initially Judge Tiger accepted it and then he set it aside. So my question is, for you to win clean, don't we have to decide that there's no distinction between – that Napster just applies straight out? Your Honor, we'd submit that the – yes, the tests that are articulated in those cases, and Perfect Ten doesn't say we have a special rule on what it means for practical ability for platform cases. In fact, at page – I would refer you to page 1174. And what the court says is, our case, which is a platform case, is different on practical ability than Phonavisa. And the reason was that in Phonavisa, the swap meet operator had the ability to quote, identify and police the conduct. Now – Well, I guess I don't understand. You're saying Disney's in the room and they just choose not to look at the screen. So I don't understand why there's not an ability to investigate. You're saying, oh, but, you know, Reardon should have sent a letter, shouldn't – but the law puts on the even innocent infringer the obligation to be guarding because they're in a better position to guard against infringement than the copyright owner who's not in the room, right? Who's not in the room. Disney just chose not to look at that screen, right? But they were in the room when those copyrights keep flashing on the MOVA screen. Let me get to the second point. And perhaps it's because, you know, our law says it's on the duty of the even innocent infringer because you can either get indemnification or you can do due diligence inquiry. So, Your Honor – That's where the burden is on these cases, correct? No. Let me get to the second point on the copyright notice. Because we've established that at least there is no – there is no evidence in the record. But the second point is, had they seen a one-second copyright notice, that would have told them nothing. I guess this is the question. Why couldn't the jury have reasonably concluded that Disney had the practical ability to conduct that due diligence in that room when it's showing up on the screen? Why couldn't a reasonable jury have come to that conclusion? That would – first of all, Your Honor, if the argument is that there was a copyright notice that flashed with the name of a copyright owner, that that indicates that infringing conduct is going on, that would be an extraordinary ruling, Your  With respect, the fact that a copyright notice appears in the header screen of a copyright is not at all unusual. The fact that it would have had Reardon's name when it was known – Well, I guess what I'm wondering is, if you make those arguments, isn't that why you win in front of a jury? But when it's a JMOL, we have to give all inferences in favor of the verdict, right? And to the party that got the verdict. So I guess what Judge Koh is saying is, why couldn't a jury, with all that they know otherwise, and you could win on – they could have found every – you know, they obviously bought some of your arguments. They didn't buy – they wanted a lot more money. But why couldn't a jury have reasonably inferred from those facts that Disney had the practical ability to do it? Whether they did or they didn't, but they had it. Why couldn't they infer that? Because, Your Honor, on the copyright notice point, because there is nothing about the presence of a copyright notice on the one second when a frame – when something – when a program boots up or something plays that says, oh, you don't – you have to go investigate whether this is authorized. It happens with every computer program that at least I still boot up on my machine. There's a copyright notice that flashes up. I don't sit there and say, oh, I'm on notice that there's copyright infringement. There just isn't. That wouldn't have put them – that wouldn't have put them on notice. The question was to the – Well, but the jury obviously thought it did. Well, with respect to – So, I mean, I'm not saying you don't have a good argument, but you lost there. So then we have to look at the JLML in terms of is there any way that this verdict can be sustained? Totally – Not whether it would be our choice or not whether how we would have ruled. I understand that that's a standard, Judge Callahan, but we think that what – as Judge Tiger went through the evidence that was put forward by Reardon in opposition to our JNOB motion, he went through the trial evidence. He sat through the trial evidence. And what he found was there was nothing in the record that made infringing conduct detectable. And that is what Napster says you have to have. That's what FONAVISA says. It says it regardless of whether it is in the platform world or in the physical world. You still need to have something where you have – But knowledge of direct infringement is not an element of vicarious liability. You agree with that, right? That is the law. I do. And so it seems like you are pushing that that knowledge is required, and that's the ability to identify infringement, which the jury could have reasonably concluded that ability existed. Your Honor, what this Court's cases say, it's not that I'm trying to push it. I'm taking the language from the Napster case, from the FONAVISA case, from the VHT v. Zillow case, and from Perfect Ten v. Amazon. I'm taking this Court's standards. This Court's standards say that practical ability means something. It means the ability to identify and police, to control and patrol. And the patrol here, what you're talking about, is the loading of – Actually, let me correct myself. The district court imposed that ability to identify infringement. But that's – I think that that actually has not been what's been required in our cases. I'm going to quote from Grokster. Vicarious liability allows imposition of liability when the defendant profits directly from infringement and has a right and ability to supervise the direct infringer even if the defendant initially lacks knowledge of the infringement. So we have just repeatedly said knowledge is not required. We're not talking about knowledge here, Your Honor. We're talking about the practical ability to identify and to control. And in the Perfect Ten v. Amazon case, 508F3rd at 1174, the Court says what distinguishes that case from another platform case, Napster, and from the Phone-a-Visa case in the physical world was in those cases, the word is they had the ability to identify and police the infringing activity by patrolling the premises. The premises here, Your Honor – Were in the room with the MOVA screen, and it wasn't being patrolled. Your Honor, I will say again, even if there was evidence that somebody saw a copyright notice, that would not put anyone on notice that that was an infringing use. And I will just say one other thing on the copyright notice, Your Honor. That copyright notice appeared because it was there on the raw.exe files. That would have been there during the years that Reardon didn't own it, indisputably didn't own it, from 2012 to 2013. Vendors who are using software are going to have lots of things appear. They don't – they aren't a red flashing light that says the use of this is infringing. Let me ask you this, just really quickly, and we'll – unless my colleagues have other – whatever our decision is, should we publish? Or is this a case that's too fact-specific to provide much guidance to the bench and bar? I would say, Your Honor, that the decision here follows from the Court's precedent. As I've tried to articulate, I don't think you can – I don't think you can say that the world is divided into platform cases and non-platform cases. So Napster at all covers this? When they are – when Napster – when they are applying the same standard and referring back to one another. I do think that the issues in these cases and what the evolution of the law, frankly, from the Shapiro case, which itself looked to things like landlord-tenant, dance hall, employer-employee, and trying to figure things out, there has been a – there has been an evolution in that area. And one of the things that the Court – Well, it would seem to me, if we accept what you're saying and you prevail, that we would be saying, as a matter of law, on these facts, there was no practical ability to identify. Correct. So that's a little different. It's a – we think it actually follows from some of the other cases. As to whether or not it's important to put it out there, I do think that if – one thing I would say, Your Honor, and this is what the evidence of trial was, which is that if a motion picture producer, if anyone who contracts with a software – with somebody who is providing high-tech services is all of a sudden strictly liable and on the hook for going through and evaluating, not just saying, do you have proof of ownership, because we know DD3 would have given them something here, but you're responsible and you're on the hook if two years later a judge says, yes, I have found that under this stealth transaction that Mr. Perlman engaged in, he reacquired ownership of – he reacquired ownership of – that, Your Honor, I think would be revolutionary. And I would just say there was no evidence, none, that there is any problem – and think about this. Unlike in the Shapiro case, where there was evidence that there was problems with bootleg recordings being sold through department stores, and the Second Circuit, quite rightly, wondered, we don't want to put the department store in a position where they can just turn their eyes away and let all this infringement happen. And it's what this Court said.   Kagan.  Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan.              Kagan.  The case law establishes that a defendant like Disney has the ability to protect against what you just said would be this revolutionary holding by having indemnification agreements in their contracts, and Disney had that here. So it doesn't seem that outlandish to follow the case law that says this is strict liability. You've taken steps. The company has taken steps to protect itself. So why does that make this just so unheard of when the company clearly knew that they could take those steps, and they did, and that they should, and that they did? Your Honor, the indemnification, two things. The indemnification is only as good as the party behind it. And here we had somebody who was saying that, who was threatening and saying that the use of our technology in this little part of this massive production pipeline was responsible for tens of millions of dollars in profits. And the second thing is we have been litigating this case now for eight years through to this point. So a representation warranty is a good thing. And if there was a problem, then we have those for a reason. And you also have insurance. I mean, all of these issues that are built into these contracts to deal with this potential problem. Again, Your Honor, Google has insurance. Zillow had insurance. Zillow, Napster, Google, they all had terms of use with their users. They could have gone after those people as well. Simply having that legal right, no case has ever said, and I'll come to the Shapiro case where it said that's something to focus on. But no case, certainly none of this Court's cases, has said, oh, if you've got representations and warranties, we don't need to worry about practical ability to control. But we don't have to, but the cases have said that knowledge is not a requirement. Knowledge is not a requirement, but detectable acts of infringement are. The way that Napster says it is, the reason that you have vicarious liability, where you get it is where somebody turns a blind eye to detectable acts of copyright infringement. Thank you. All right, there are no further questions of you. Thank you for your argument. Thank you, Your Honor. All right, and I gave you two minutes for rebuttal. I'll be very brief. If it matters, there is a small gold statue that goes with this. Mr. Cotter, the programmer, proudly displayed it behind him in his video deposition, which was shown to the jury. Mr. Claus is arguing not just for constructive knowledge here. They're asking this Court to agree that actual knowledge is required. He said that zero evidence that anyone actually saw the Hollywood Reporter article and zero evidence that they saw the Reardon copyright notice. So unless Disney sees the copyright notice, unless Disney actually sees the Hollywood Reporter article, then we're not going to impose liability. I don't exactly agree. Anytime anyone tells me there's no or there's zero, I automatically, my skeptical antenna go up. But there were not people that testified that said they saw it. The way I would characterize the evidence, and I don't mean to cut you off, is you said when it appears on the screen. So then from that, what inferences can flow from that? Right, Your Honor. I mean, there were not witnesses that were called that said that I saw that. That doesn't mean there was zero evidence. It means no witness testified to that. Right. And Mr. Claus is right. Knowledge is not required in the law. There were hundreds. The testimony showed there were hundreds of MOVA files that were displayed, hundreds, because there were multiple takes for each scene. The director will say, okay, give me that scene again, but give me a little snarl here or whatever. And so there will be multiple takes. There were hundreds of these files, hundreds of opportunities to see the copyright notice, and it wasn't there. Mr. Claus said in the Google case, there was a contract. That's true. I direct the Court to the Court's analysis on that. It was an advertising contract. It's sharing advertising revenue for those third-party websites, and the Court examined that and said there's no right to supervise or control the content that's being posted. Vona Visa, he said that the liability was — You've gone over in your extra time, so please wrap it up. Okay. Your Honor, there was a statement that Google and Zillow in those cases, that they required insurance from the users of their website. Defy counsel to point us to where that is. It's nowhere in there. There isn't a contract between Google and its users other than this advertising contract with third-party websites that didn't give them any control over content. Thank you very much, Your Honor. All right, thank you both for your arguments in this matter. This will stand submitted.
judges: CALLAHAN, BADE, KOH